IN THE COURT OF APPEALS OF NORTH CAROLINA

No. COA23-210

Filed 3 September 2024

Wake County, Nos. 19CRS221093-94, 21CRS1787

STATE OF NORTH CAROLINA

v.

KEDRICK DAQUANE THOMAS, Defendant.

Appeal by defendant from judgments entered 20 December 2021 and 23 February 2022 by Judge Keith O. Gregory in Superior Court, Wake County. Heard in the Court of Appeals 3 October 2023.

*Attorney General Joshua H. Stein, by Assistant Attorney General Benjamin Szany, for the State.*

*Marilyn G. Ozer for defendant-appellant.*

STROUD, Judge.

Defendant appeals from judgments convicting him of one count of second-degree murder, one count of assault with a deadly weapon with intent to kill or seriously injure, and attaining the status of violent habitual felon. Because the Defendant was a supervisee on post-release supervision including electronic monitoring by an ankle monitor, he did not have a reasonable expectation of privacy as to the tracking data from his ankle monitor that would prevent a law enforcement officer authorized to access the data from doing so as part of the investigation of a crime, so the trial court did not err by denying his motion to suppress this evidence.

But because an alternate juror was substituted for one of the original jurors after the jury had begun deliberations, albeit without objection from Defendant, we are required to grant Defendant a new trial based upon *State v. Chambers*, ___ N.C. App. ___, ___, 898 S.E.2d 86, 88 (2024).[1] Thus, we will not address his remaining issues presented on appeal as they may not arise at a new trial.

## I. Background

The State's evidence tended to show that on the night of 8 November 2019, a shooting occurred at a convenience store on Bragg Street in Raleigh, North Carolina. Kimberly Holder, who was hanging out outside the store with a group of friends, was shot and killed; Ron Hyman was shot and seriously injured.[2]

Witnesses described a red Charger slowing down near the scene of the shooting immediately before the shooting and taking off immediately after. Video footage recordings of the scene showed a red Charger applying its brakes, as indicated by the car's brake lights, and slowing down as it approached the convenience store. The investigation by the Raleigh Police Department ("RPD") connected the red Charger to Ivette Uriostegui and her boyfriend, Stephon McQueen. Police also had a confidential source who reported Mr. McQueen and Defendant were connected to the

[1] On 26 June 2024, the Supreme Court of North Carolina granted the State's petition for Writ of Supersedeas and for discretionary review of *Chambers*, but this Court remains bound by this precedent. *See State v. Chambers*, No. 56PA24 (N.C. June 26, 2024).

[2] The State further alleged two other victims were shot, Bonnie Jones and Geann Onivagui; however, the State dismissed the charges related to Bonnie Jones and the jury found Defendant not guilty of the assault involving Geann Onivagui.

shooting.

After researching "some background information" on Defendant, police learned that on the date of the shooting he was wearing a GPS ankle monitor which catalogued his location. An employee of BI Incorporated, a company that is "contracted with the State of North Carolina to provide electronic monitoring services for Department of Juvenile Justice and the Department of Adult Probation and Parole[,]" testified the ankle monitor Defendant was wearing at the time of the shooting reported his location in sixty second intervals. The employee testified RPD has "two different levels of access." One level of access is described as a "data dump" in which a police department "criminal analyst gets a - - basically, the live file at the end of the day every day" which includes data on "every single client." The second level of access included "individual users that have their own individual log-ins. . . . They can retrieve records and view them." In 2019, about ten officers from RPD had this second level of access.

Sergeant Lane of RPD testified he ran Defendant's name through a database and found he was wearing the ankle monitor through Community Corrections, so Sergeant Lane "went into BI, typed the name in, and started looking at the points from that night." Sergeant Lane was one of the ten officers with access to BI's software. Defendant's ankle monitor showed he was travelling towards the scene of the shooting before it happened, was near the shooting at the time it happened, and was travelling away from the scene after it happened. Sergeant Lane did not have a

search warrant before looking into the GPS information from Defendant's ankle monitor.

Police arrested Defendant on 14 November 2019. Defendant spoke to police officers and admitted he was on Bragg Street at the time of the shooting but claimed he was not in the red Charger. Defendant was ultimately indicted on or about 3 December 2019 for first-degree murder and three counts of assault with a deadly weapon with intent to kill or seriously injure. Defendant was also indicted on or about 26 October 2021 for attaining the status of a violent habitual felon.

Police arrested Mr. McQueen and Ms. Uriostegui in Texas on 15 November 2019. Mr. McQueen admitted to police he was the driver of the red Charger the night of the shooting, Ms. Uriostegui was in the front passenger seat, and Defendant was in the "rear of the vehicle as the only other occupant." Further, Mr. McQueen

> admitted to driving the vehicle down the Bragg Street area slowly, coming almost to a stop in front of the store, and that then numerous rounds were fired. And he looked around his back, he didn't know what was going on, and he observed [Defendant] firing the weapon from the interior of the car.

Mr. McQueen also indicated to police that Defendant had been robbed "several weeks" before the shooting and that there was a "rumor on the street that [Defendant] was snitching or giving up information on people" and Defendant was upset about both events.

On 3 December 2021, Defendant filed a motion to suppress the ankle monitor

data. The motion to suppress alleged that "on November 14, 2018, the defendant was placed on probation for felony possession of cocaine in file number 18 CRS 208275 in Wake County, North Carolina" and that electronic monitoring was "included or added at a later date" as a special condition of probation. Defendant contended the controlling statute was North Carolina General Statute Section 15A-1343(b)(13), which did not allow police to access Defendant's ankle monitor data without a warrant and since the police did not have a warrant, the evidence should be suppressed under "the Fourth and Fourteenth Amendments of the United States Constitution" and "Article 1, 19, 23, and 27 of the North Carolina State Constitution." The trial court denied Defendant's motion to suppress.

Jury selection began on 6 December 2021. During jury selection, Juror number 8 informed the trial court that he had a vacation planned beginning on Sunday of the next week and would be able to sit for the jury if the trial ended before then. The State and Defendant both accepted Juror 8, who was then seated on the jury. During the trial, the trial court indicated it was possible the trial would not end as soon as previously thought and it may need to substitute an alternate for Juror 8. However, Juror 8 remained on the jury until they began deliberations on 17 December 2021. On 17 December 2021, during jury deliberations, the trial court received a note from the jury which read "[w]e have a hung jury situation at this point. After reviewing the evidence and discussing it thoroughly, we are not seeing any movement towards a decision." The trial court then suggested that it may have to release Juror 8 since

the jury had not come to a decision before Juror 8 was scheduled to leave for a vacation; neither the State nor Defendant objected to the juror's release. The trial court ultimately released Juror 8 and replaced him with Alternate Juror 1, and the trial court instructed the jury that "the jury would now be required to start their deliberations over because the alternate juror was not privy to the previous deliberations. So you would be required to start the deliberations over." The jury then returned its verdicts on 20 December 2021, finding Defendant guilty of second-degree murder for the killing of Kimberly Holder and assault with a deadly weapon with intent to kill or seriously injure for the shooting of Ron Hyman.

Defendant's violent habitual felon proceeding began on 21 February 2022. Kimberly Holder's family was in the courtroom watching the proceedings, and one of the family members was wearing a shirt with the statement "Justice for Kim" and a picture of Ms. Holder on the front of the shirt. Defendant objected to the shirt and stated it could violate Defendant's due process rights. Defendant asked the trial court to require the shirt be worn inside out or covered up. The trial court found that only one person in the courtroom was wearing the shirt and ultimately denied Defendant's objection to the shirt as it was not prejudicial to Defendant. The next day, another family member was wearing the same shirt, Defendant renewed his objection, and the trial court again denied it.

The jury convicted Defendant as a violent habitual felon. Defendant was sentenced to two life sentences without the possibility of parole. Defendant gave oral

notice of appeal in open court.

## II. Issues on Appeal

Defendant makes four arguments on appeal. Defendant's first argument is that the trial court erred by denying his motion to suppress because "a Raleigh patrol officer accessed data from the ankle monitor worn by Defendant in violation of the constitutional prohibition against warrantless searches." (Capitalization altered.) Defendant's third issue presented on appeal is that "Defendant's state constitutional right to have his guilt determined by a properly constituted jury of twelve was violated when a juror was excused and replaced by an alternate after deliberations had begun and the jury had informed the court it was hung." (Capitalization altered.) Defendant also makes two additional arguments on appeal: that "the court erred by admitting testimony concerning an armed robbery in which Defendant was the victim and an undefined involvement in a murder[;]" and that "t-shirts bearing the photo of the victim worn in the courtroom and calling for justice violated Defendant's right to a fair trial by an impartial jury." (Capitalization altered.)

## A. Substitution of Alternate Juror

We will address Defendant's third issue first, as we are required by *Chambers* to grant Defendant a new trial based upon the substitution of an alternate juror after the jury had begun deliberations. *See Chambers*, ___ N.C. App. at ___, 898 S.E.2d at 88. Although North Carolina General Statute Section 15A-1215 was amended in 2021 to allow substitution of an alternate juror after deliberations have begun, on 20

February 2024 in *Chambers*, this Court held the 2021 amendment to North Carolina General Statute Section 15A-1215 allowing a juror substitution after deliberations have begun was unconstitutional. *See id*. Although the Supreme Court of North Carolina has granted discretionary review of *Chamber*s, this Court remains bound by *Chambers* and we are therefore required to grant Defendant's request for a new trial based upon the juror substitution. *See id*. Because we are required to grant Defendant a new trial, we need not address Defendant's arguments as to the testimony regarding his earlier bad acts or the t-shirts worn by the victim's family as these issues may not arise at the new trial. However, we will address the trial court's denial of Defendant's motion to suppress since that issue will arise at the new trial.

## B. Motion to Suppress Defendant's Ankle Monitor Data

Defendant first contends his rights under the Fourth Amendment of the United States Constitution were violated when Sergeant Lane obtained the data from his ankle monitor without first getting a search warrant.

"The standard of review for alleged violations of constitutional rights is *de novo*." *State v. Hamilton*, 262 N.C. App. 650, 654, 822 S.E.2d 548, 552 (2018) (citation omitted). Under the Fourth Amendment, "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated[.]" U.S. Const. amend. IV. It is well-established that in "considering whether a warrantless search was unreasonable, the inquiry focuses on whether an individual has manifested a subjective expectation of privacy in the

object of the challenged search, and society is willing to recognize that expectation as reasonable." *State v. Grice*, 367 N.C. 753, 756, 767 S.E.2d 312, 315 (2015) (citation, quotation marks, brackets, and emphasis omitted). The United States Supreme Court has held that "a State also conducts a search when it attaches a device to a person's body, without consent, for the purpose of tracking that individual's movements." *Grady v. North Carolina*, 575 U.S. 306, 309, 191 L. Ed. 2d 459, 461-62 (2015).

But here, Defendant's argument does not arise from the attachment of the ankle monitor to his body; he does not contend it was unconstitutional for him to be subjected to electronic monitoring as a condition of post-release supervision ("PRS"). Instead, his argument is the State exceeded the scope of the search allowed by North Carolina General Statute Section 15A-1368.4 because the law enforcement officer who accessed the data from his ankle monitor was not his supervising officer under his PRS.

Defendant contends under North Carolina General Statute Section 15A-1343(b1)(3c), only officers from Defendant's probation or parole supervising agency could check the GPS data shown by Defendant's ankle monitor without first obtaining a search warrant, but officers with RPD could not do so. The State first contends that the record is not clear on whether Defendant was wearing an ankle monitor under North Carolina General Statute Section 15A-1343(b1)(3c) as a condition of probation or under North Carolina General Statute Section 15A-1368.4 as a condition of PRS.

*Compare* N.C. Gen. Stat. § 15A-1343 (2023) ("Conditions of probation") *with* N.C. Gen.

Stat. § 15A-1368.4 (2023) ("Conditions of post-release supervision").

The trial court did not enter a written order denying the motion to suppress

and did not make any findings of fact on the record. Since there is no written order,

we must first determine if there was any "material conflict in the evidence" relevant

to Defendant's monitoring.

> In determining whether evidence should be suppressed,
> the trial court shall make findings of fact and conclusions
> of law which shall be included in the record. N.C.G.S. §
> 15A-974(b) (2013); *see also id.* § 15A-977(f) (2013) ("The
> judge must set forth in the record his findings of facts and
> conclusions of law."). A written determination setting forth
> the findings and conclusions is not necessary, but it is the
> better practice. Although the statute's directive is in the
> imperative form, only a material conflict in the evidence –
> one that potentially affects the outcome of the suppression
> motion – must be resolved by explicit factual findings that
> show the basis for the trial court's ruling. When there is no
> conflict in the evidence, the trial court's findings can be
> inferred from its decision. Thus, our cases require findings
> of fact only when there is a material conflict in the evidence
> and allow the trial court to make these findings either
> orally or in writing.

*State v. Bartlett*, 368 N.C. 309, 312, 776 S.E.2d 672, 674 (2015) (citations and

quotation marks omitted).

Here, Defendant's argument on the motion to suppress was primarily a legal

argument, but both Defendant and the State argue there are potential differences in

the analysis of this argument depending upon whether Defendant's monitoring was

conducted as a condition of probation or a condition of post-release supervision.

Thus, there is one fact necessary for our review of the order on appeal since the statutes addressing electronic monitoring for probation are different from electronic monitoring for PRS. Initially, there was some confusion at trial over the legal basis for Defendant's ankle monitoring, but ultimately there was no "material conflict" in the evidence; the evidence showed Defendant's monitoring was imposed under North Carolina General Statute Section 15A-1368.4 as a condition of post-release supervision.

In Defendant's motion to suppress, he alleged that "on November 14, 2018, the defendant was placed on probation for felony possession of cocaine in file number 18CR208275 in Wake County, North Carolina" and that electronic monitoring was "included or added at a later date" as a special condition of probation. On 3 December 2021, the trial court heard and ruled on about 21 various motions, including its initial ruling on the motion to suppress. At that hearing, the State noted the motion to suppress and informed the trial court that Defendant "was not on probation but he was actually on parole at the time." Defendant's attorney apparently agreed and informed the trial court,

> [t]his is post-supervision. He's not on - - he's not on standard conditions of probation, so it's a less sort of monitoring system and restrictions and it has sort of measures in place. So it's for curfew, make sure he's where he's supposed to be when he's supposed to be."

The trial court initially denied the motion to suppress based upon the fact that it was not "timely filed." But at another pretrial hearing on 6 December 2021,

Defendant's counsel informed the trial court that at the previous hearing, the timeline given regarding the timing of the filing of the motion to suppress was incorrect. The State conceded this point, and the trial court then revisited the motion to suppress based upon Defendant's argument that the RPD officer's accessing the ankle monitor data was a search in violation of the Fourth Amendment on the basis of "this clearly being a search by law enforcement, not probation." Defendant requested an evidentiary hearing on the motion to suppress. Ultimately, the trial court again denied the motion to suppress without holding an evidentiary hearing on the basis that there was "no reasonable legal basis" to allow the motion. Defendant's counsel asked to be allowed to make a proffer of evidence regarding the motion to suppress after the State's presentation of testimony from Sergeant Lane and the trial court allowed this request.

During the trial, after Sergeant Lane's trial testimony and cross-examination, Defendant presented his proffer of evidence for purposes of the motion to suppress by questioning Sergeant Lane on voir dire regarding his access to and search of the ankle monitor tracking data. The evidence on voir dire tended to show that Sergeant Lane was a patrol officer with RPD when he was called to the scene of the drive-by shooting on 8 November 2019. Afterwards, he did further investigation in the area and ultimately identified Defendant as a potential suspect. After checking the CJLEADS database for Defendant's name, he found that Defendant "had an active sentence that he had been released on, and actually was on post supervision – or post-release."

Sergeant Lane did not consult with Defendant's probation officer but checked the Total Access data personally. Defendant renewed his motion after the proffer, and the trial court again denied the motion to suppress. The State did not present any evidence countering Sergeant Lane's testimony that Defendant was on PRS. In fact, the State had consistently argued from the first hearing on the motion to suppress that Defendant was on PRS and not probation. The trial court did not make any findings of fact on the record or enter a written order denying the motion to suppress.

In his brief on appeal, Defendant argues he "was on post-release supervision" in one section of his brief but in another section states Defendant "was wearing an ankle monitor pursuant to a special condition[ ] provision of N.C.[G.S.] § 15A-1343" and cites the language of North Carolina General Statute Section 15A-1343 – which deals with probation – in support of his argument. *See* N.C. Gen. Stat. § 15A-1343. But as we have determined there was no conflict in the evidence and Defendant was on PRS, we will address Defendant's arguments based only upon the basis of PRS under North Carolina General Statute Section 15A-1368.4.

In *State v. McCants*, this Court described the PRS program in detail:

> The post-release supervision program was created in the 1993 "Act to Provide for Structured Sentencing" ("Structured Sentencing Act") as Article 84A of Chapter 15A of the North Carolina General Statutes ("Article 84A"). 1993 North Carolina Laws Ch. 538, § 20.1. (H.B. 277). Post-release supervision is defined in Article 84A as:
>
> > The time for which a sentenced prisoner is released from prison before the termination of his *maximum* prison

term, *controlled by the rules and conditions of this Article.* Purposes of post-release supervision include all or any of the following: to monitor and control the prisoner in the community, to assist the prisoner in reintegrating into society, to collect restitution and other court indebtedness from the prisoner, and to continue the prisoner's treatment or education.

N.C.G.S. § 15A-1368(a)(1) (emphasis added).

Determinations regarding the imposition or violation of conditions of PRS or parole are made by the Commission, which was created by the Structured Sentencing Act: "There is hereby created a Post-Release Supervision and Parole Commission of the DAC4 of the DPS." N.C.G.S. § 143B-720(a) (2017); 1993 North Carolina Laws Ch. 538, § 20.1.5 The "general authority of the Commission is described in G.S. 143B-720." N.C.G.S. § 15A-1368(a)(3) (2017). The Commission "shall administer post-release supervision as provided in" Article 84A. N.C.G.S. § 15A-1368(b). The Commission consists of "four full-time members" "appointed by the Governor." N.C.G.S. § 143B-720(a) and (a2). Decisions concerning parole are determined by a majority vote of the Commission, however, "a three-member panel of the Commission may set the *terms and conditions* for a post-release supervisee *under G.S. 15A-1368.4* and may decide questions of violations thereunder, *including the issuance of warrants*." N.C.G.S. § 143B-721(d) (2017).

*State v. McCants*, 275 N.C. App. 801, 814-15, 854 S.E.2d 415, 426 (2020) (emphasis in original) (brackets and footnotes omitted).

A supervisee under post-release supervision is "[a] person released from incarceration and in the custody of the Division of Community Supervision and Reentry of the Department of Adult Correction and Post-Release Supervision and

Parole Commission on post-release supervision."[3] N.C. Gen. Stat. § 15A-1368(a)(2) (2023). Various conditions may be imposed upon a supervisee in PRS, and "electronic monitoring" is one of the "controlling conditions" allowed by Noth Carolina General Statute Section 15A-1368.4(13). N.C. Gen. Stat. § 15A-1368.4(13). There is no evidence in this case of the exact conditions included in Defendant's PRS, but there is no dispute Defendant was subject to electronic monitoring, and based upon Sergeant Lane's testimony, he was being monitored as a condition of PRS. In addition, in this case, Defendant has not challenged the Commission's authority to impose electronic monitoring as a condition of his PRS. *But cf. McCants*, 275 N.C. App. at 842, 854 S.E.2d at 443 ("The Commission therefore erred in imposing that unlawful condition in Defendant's case, and the Operation Arrow warrantless search of Defendant's premises lacked legal authority. Defendant's purported consent did not serve to justify the otherwise unlawful search, as Defendant was obligated by statute to consent to PRS and the conditions imposed. Defendant's compliance with his legal duty, by signing the PRS agreement and not attempting to refuse or hinder Chief Gibson from carrying out one of the conditions contained therein, was not true consent to search as contemplated by the Fourth Amendment or Art. I § 20 of the

---

[3] "(1) Post-release supervision or supervision. – The time for which a sentenced prisoner is released from prison before the termination of his maximum prison term, controlled by the rules and conditions of this Article. Purposes of post-release supervision include all or any of the following: to monitor and control the prisoner in the community, to assist the prisoner in reintegrating into society, to collect restitution and other court indebtedness from the prisoner, and to continue the prisoner's treatment or education." N.C. Gen. Stat. § 15A-1368 (2023).

North Carolina Constitution, and it did not serve to render constitutional the otherwise unconstitutional warrantless search.").

Defendant argues that only his probation officer could have access to his ankle monitoring data, based upon North Carolina General Statute Section 15A-1368.4(e)(10), which provides that a supervisee must

> (10) Submit at reasonable times to warrantless searches by a post-release supervision officer of the supervisee's person and of the supervisee's vehicle and premises while the supervisee is present for purposes reasonably related to the post-release supervision. The Commission shall not require as a condition of post-release supervision that the supervisee submit to any other searches that would otherwise be unlawful. Whenever the search consists of testing for the presence of illegal drugs, the supervisee may also be required to reimburse the Division of Adult Correction and Juvenile Justice of the Department of Public Safety for the actual cost of drug testing and drug screening, if the results are positive.

N.C. Gen. Stat. § 15A-1368.4. But this subsection addresses searches of the supervisee's person, vehicle, or premises, not electronic monitoring. *See id.* Here, there was no search of Defendant's person, vehicle, or premises. Instead, the alleged unconstitutional search here arises solely from Sergeant Lane's accessing the data generated by Defendant's electronic monitoring. Electronic monitoring is not governed by North Carolina General Statute Section 15A-1368.4(e)(10); it is governed by North Carolina General Statute Section 15A-1368.4(e)(13), which allows the Commission to impose a condition requiring a supervisee to:

> (13) Remain in one or more specified places for a specified

period or periods each day, and wear a device *that permits the defendant's compliance with the condition to be monitored electronically* and pay a fee of ninety dollars ($90.00) for the electronic monitoring device and a daily fee in an amount that reflects the actual cost of providing the electronic monitoring. The Commission may exempt a person from paying the fees only for a good cause. Fees collected under this subsection for the electronic monitoring device shall be transmitted to the State for deposit in the State's General Fund. The daily fees collected under this subsection shall be remitted to the Department of Public Safety to cover the costs of providing the electronic monitoring.

N.C. Gen. Stat. § 15A-1368.4(e)(13) (emphasis added).

As noted above, Defendant's brief includes arguments contending he was on probation instead of PRS although he addresses PRS as well, perhaps seeking to make sure all the bases were covered. The wording of the statute regarding electronic monitoring for purposes of probation is different from the PRS statute. The probation statute provides that "[t]he offender shall be required to wear a device which *permits the supervising agency to monitor* the offender's compliance with the condition electronically and to pay a fee for the device as specified in subsection (c2) of this section." N.C. Gen. Stat. § 15A-1343(b1)(3c). Although we express no opinion regarding access to data arising from electronic monitoring a person on probation, the difference in the language of the statute is notable as the probation statute states that the "supervising agency" monitors the defendant's compliance. *See id.* The PRS statute simply allows a supervisee "to be monitored electronically," without limiting which law enforcement agency or personnel may access data to review a supervisee's

compliance with the condition that he "remain in one or more specified places." N.C. Gen. Stat. § 15A-1368.4(e)(13).

In addition, even within North Carolina General Statute Section 15A-1368.4, the language regarding warrantless searches of supervisees differs from the language regarding electronic monitoring. *See id.* North Carolina General Statute Section 15A-1368.4(e)(10) provides that the "post-release supervision officer" may conduct warrantless searches "at reasonable times" "of the supervisee's person and of the supervisee's vehicle and premises while the supervisee is present for purposes reasonably related to the post-release supervision." N.C. Gen. Stat. § 15A-1368.4(e)(10). But subsection (e)(13) does not limit the access to electronic monitoring data to the supervisee's post-release supervision officer or any particular law enforcement agency. N.C. Gen. Stat. § 15A-1368.4(e)(13). Instead, a supervisee can be required to "remain in one or more specified places" at specific times and to "wear a device that permits the defendant's compliance with the condition *to be monitored electronically*[.]" *Id.* (emphasis added).

The evidence showed that the Department of Juvenile Justice and the Department of Adult Probation and Parole has contracted with BI Incorporated "to provide electronic monitoring services" for PRS and this information is made available to authorized officers within law enforcement agencies such as RPD. If the General Assembly wanted to impose the same restrictions and limitations on access to electronic monitoring data for purposes of probation, it could have done so. In fact,

for PRS, the General Assembly did impose different limitations for searches of "the supervisee's person and of the supervisee's vehicle and premises" than for electronic monitoring as a condition of PRS. *See* N.C. Gen. Stat. § 15A-1368.4. The language of the statute governing warrantless searches of the person, vehicle, or premises is different from that governing electronic monitoring, and we must presume the statutes mean what they say. *See N.C. Dep't of Corr. v. N.C. Med. Bd.*, 363 N.C. 189, 201, 675 S.E.2d 641, 649 (2009) ("Because the actual words of the legislature are the clearest manifestation of its intent, we give every word of the statute effect, presuming that the legislature carefully chose each word used." (citation omitted)).

We also stress that we cannot address the exact conditions of Defendant's PRS because notably, Defendant did not provide either to the trial court or to this Court the judgment for his prior conviction under which he was imprisoned before being released on PRS or any documentation from the Post-Release Supervision and Parole Commission regarding the details of his PRS.[4] Under North Carolina General Statute Section 15A-1368.4, the Commission must set certain required conditions for each supervisee and may set additional required conditions, discretionary conditions, reintegrative conditions, and controlling conditions, depending upon the circumstances of the particular case. *See* N.C. Gen. Stat. § 15A-1368.4. Since

---

[4] In contrast, in *State v. McCants*, this Court addressed many details of the defendant's PRS and the specific conditions imposed as well as why particular conditions were imposed on the defendant, but here, this information was not in evidence. *See McCants*, 275 N.C. App. at 835-39, 854 S.E.2d at 438-41.

Defendant has the duty to provide any information necessary for review of his arguments, we are addressing only the information provided by Defendant in this record. *See State v. Alston*, 307 N.C. 321, 341, 298 S.E.2d 631, 644 (1983) ("It is the appellant's duty and responsibility to see that the record is in proper form and complete." (citation omitted)). According to the evidence presented in this case, Defendant was subject to electronic monitoring as a condition of his PRS. Defendant was required as a condition of his PRS to "[r]emain in one or more specified places for a specified period or periods each day, and wear a device that permits the defendant's compliance with the condition to be monitored electronically[.]" N.C. Gen. Stat. § 15A-1368.4(e)(13).

Thus, the question here is whether Defendant may have a reasonable expectation of privacy in the location data generated by his ankle monitor, where his monitoring was legally being conducted as a condition of PRS and the officer who accessed the location data was authorized to access the data directly, without going through another agency or officer. The State contends that to the extent Defendant believed he had an expectation of privacy as to his location data, particularly as to authorized law enforcement agencies, this belief is "unreasonable and not one that society is prepared to recognize as reasonable." Thus, the State contends "law enforcement's mere review of Defendant's location from his ankle monitor did not constitute a search."

The State is correct; under these circumstances, Sergeant Lane's accessing

the ankle monitor data was not a "search" as defined by law. As the United States

Supreme Court noted in *Kyllo*, most warrantless searches of a home are unreasonable

and thus unconstitutional:

> On the other hand, the antecedent question whether or not a Fourth Amendment "search" has occurred is not so simple under our precedent. . . .
>
> In assessing when a search is not a search, we have applied somewhat in reverse the principle first enunciated in *Katz v. United States*, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967). *Katz* involved eavesdropping by means of an electronic listening device placed on the outside of a telephone booth—a location not within the catalog (persons, houses, papers, and effects) that the Fourth Amendment protects against unreasonable searches. We held that the Fourth Amendment nonetheless protected Katz from the warrantless eavesdropping because he justifiably relied upon the privacy of the telephone booth. As Justice Harlan's oft-quoted concurrence described it, a Fourth Amendment search occurs when the government violates a subjective expectation of privacy that society recognizes as reasonable. We have subsequently applied this principle to hold that a Fourth Amendment search does *not* occur—even when the explicitly protected location of a house is concerned—unless the individual manifested a subjective expectation of privacy in the object of the challenged search, and society is willing to recognize that expectation as reasonable. We have applied this test in holding that it is not a search for the police to use a pen register at the phone company to determine what numbers were dialed in a private home, and we have applied the test on two different occasions in holding that aerial surveillance of private homes and surrounding areas does not constitute a search[.]

*Kyllo v. United States*, 533 U.S. 27, 31-33, 150 L. Ed. 2d 94, 100-01 (2001) (emphasis

in original) (citations, quotation marks, and brackets omitted).

As a general principle, a defendant on PRS has a lower expectation of privacy than a defendant who has either completed his sentence or is subject to lifetime satellite-based monitoring. *See State v. Carter*, 283 N.C. App. 61, 69, 872 S.E.2d 802, 807-08 (2022) ("An offender subject to post-release supervision has a diminished privacy expectation. *See Samson v. California*, 547 U.S. 843, 844, 126 S.Ct. 2193, 165 L. Ed. 2d 250, 254 (2006) ('An inmate electing to complete his sentence out of physical custody remains in the Department of Corrections' legal custody for the remainder of his term and must comply with the terms and conditions of his parole. The extent and reach of those conditions demonstrate that parolees have severely diminished privacy expectations by virtue of their status alone.'); *Hilton*, ('SBM is clearly constitutionally reasonable during a defendant's post-release supervision period.'); § 15A-1368.4(b1)(6) (mandating SBM as a condition of post-release supervision for recidivists). So SBM as a condition of Defendant's 60-month period post-release supervision is constitutional."); *see also State v. Grady*, 259 N.C. App. 664, 670, 817 S.E.2d 18, 24 (2018) ("Supervised offenders include probationers and individuals under post-release supervision following active sentences in the custody of the Division of Adult Correction. These individuals 'are on the "continuum" of state-imposed punishments[,]' and their expectations of privacy are accordingly diminished. Unsupervised offenders, however, are statutorily required to submit to SBM, but are not otherwise subject to any direct supervision by State officers." (citation omitted)).

In support of his argument that only probation or parole officers can access a defendant's ankle monitor data without a warrant, Defendant cites to caselaw which indicates law enforcement cannot conduct a warrantless search of a defendant's person, residence, or vehicle without the participation of the defendant's probation or parole officer and caselaw where a place was searched without statutory authorization. *See State v. Grant*, 40 N.C. App. 58, 60, 252 S.E.2d 98, 99 (1979) ("[T]he requirement that [the defendant] submit to a search by *any* law enforcement officer without a warrant is invalid." (emphasis added)); *see also U.S. v. Midgette*, 478 F.3d 616, 626 (2007) ("In sum, these North Carolina cases hold that police officers may conduct the warrantless search of a probationer – indeed may even suggest the search – so long as the search is authorized and directed by the probation officer."); *McCants*, 275 N.C. App. at 841, 854 S.E.2d at 442 ("We hold the trial court erred by denying Defendant's motion to suppress the firearm and other evidence found as the result of the 11 May 2017 warrantless search of the Home."). But these cases address specific provisions of the statute governing searches of the person, residence, or vehicle of defendants on probation, not electronic monitoring of supervisees on PRS. The expectation of privacy is lower for a supervisee on PRS, and any expectation that an authorized law enforcement agency would not be able to access location tracking data is clearly unreasonable where the PRS statute does not limit the law enforcement agencies or personnel who may access the electronic monitoring data.

Here, a manager from BI Incorporated, the agency which provides the

electronic monitoring services for North Carolina, testified "authorized users" have access to the GPS data, and authorized users are "officers of the North Carolina Department of Probation and Parole, Juvenile Justice and . . . the Department of Public Safety has vetted certain law enforcement agencies to be able to view this information[,]" which includes a screening process through the Department of Public Safety. Defendant was subject to electronic monitoring under PRS, and Sergeant Lane had authorization from DPS to utilize ankle monitor data maintained by BI Incorporated. Sergeant Lane reviewed only GPS data; he did not search Defendant's home, vehicle, or person. As a supervisee under PRS under North Carolina General Statute Section 15A-1368.4, Defendant had a lower expectation of privacy than the offenders subject to lifetime SBM under the *Grady* caselaw who were "unsupervised" but still subject to *lifetime* satellite based-monitoring. *See Grady*, 259 N.C. App. at 670, 676, 817 S.E.2d at 24, 28.

Therefore, the trial court did not err by denying Defendant's motion to suppress and properly allowed the State to present evidence as to Defendant's ankle monitor at trial.

### III.  Conclusion

Since this Court recently held North Carolina General Statute Section 15A-1215(a) is unconstitutional, and we are bound by our precedent, we must grant Defendant a new trial as a juror was substituted after deliberations had begun. We further affirm the trial court's denial of Defendant's motion to suppress as to the data

from his ankle monitor and this evidence may be used in the new trial. Finally, as we must grant a new trial, we need not address the evidentiary issues involving Defendant's prior bad acts and the shirts worn by the victim's family members during part of the trial as these issues may not arise at the new trial.

AFFIRMED AND NEW TRIAL.

Judges ZACHARY and MURPHY concur.